Joseph W. Cotchett (36324)
jcotchett@cpmlegal.com
Steven N. Williams (175489)
swilliams@cpmelgal.com
Nancy L. Fineman (124970)
nfineman@cpmlegal.com
Douglas Y. Park (233398)
dpark@cpmlegal.com
Matthew K. Edling (250940)
medling@cpmlegal.com
**COTCHETT, PITRE & McCARTHY**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile:  (650) 697-0577

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NUTS FOR CANDY,** | **Case No. CV 08-2873 JSW** |
| Plaintiff, | **DECLARATION OF MATTHEW K. EDLING IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR APPOINTMENT OF INTERIM LEAD COUNSEL** |
| vs. | |
| **GANZ, INC., et al.,** | |
| Defendants. | |

Date:        October 10, 2008
Time:        9:00 a.m.
Judge:       Hon. Jeffrey S. White
Courtroom:   Courtroom 2, 17th Floor

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

**DECLARATION OF MATTHEW K. EDLING IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR APPOINTMENT OF INTERIM LEAD COUNSEL**

I, Matthew K. Edling, declare as follows:

1.      I am an attorney duly licensed by the State of California and am admitted to practice before this Court. I am an associate of the law firm of Cotchett, Pitre & McCarthy, attorneys of record for plaintiff Nuts for Candy. The matters set forth herein are within my personal knowledge, and if called and sworn as a witness I could competently testify regarding them. I make this declaration pursuant to 28 U.S.C. § 1746.

2.      On June 9th, 2008, our firm filed a complaint in the Northern District of California on behalf of our client Nuts for Candy. This complaint was the first complaint on file in any judicial district relating to tying arrangements of WEBKINZ products and "core line" products from Ganz Inc. and Ganz U.S.A. ("Defendants"). The complaint was attached as Exhibit A to Steven N. Williams Declaration In Support of Plaintiff's Interim Lead Counsel Motion.

3.      On July 11, 2008, Plaintiff Cortes Country Stores, Inc. filed a lawsuit in the Massachusetts District Court alleging that Ganz, Inc. and Ganz U.S.A. LLC participated in an illegal tying arrangement. The allegations in the complaint filed by Plaintiff Cortes Country Stores against Ganz are substantially identical to the allegations in the *Nuts for Candy* Action. A copy of this complaint is attached as <u>Exhibit A</u>.

4.      On July 22, 2008, Plaintiffs Scott and Sherri Comstock d/b/a The Cheshire Cat and The Spotted Crocodile, filed a lawsuit in the Northern District of Illinois, Eastern Division against Ganz, Inc. and Ganz U.S.A. LLC. The allegations in that complaint are substantially identical to those in the *Nuts for Candy* Action and in the Cortes Country Stores action. A copy of this complaint is attached as <u>Exhibit B</u>.

5.      On July 30, 2008, Nuts for Candy filed with the Judicial Panel for Multidistrict Litigation a Motion for Transfer and Consolidation of Related Actions to the Northern District of California Pursuant to 28 U.S.C. § 1407 for Coordinated Consolidated Pretrial Proceedings. A copy of this motion was attached as Exhibit C to the Declaration of Lisa I. Carteen in Support of Defendants' Opposition To Plaintiff's Motion for Appointment of Interim Lead Counsel.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**DECLARATION OF MATTHEW K. EDLING IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR APPOINTMENT OF INTERIM LEAD COUNSEL**    1

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct.  Executed this 15th day of August 2008 at Burlingame, California.

3

4                                        /s/ Matthew K. Edling
                                         MATTHEW K. EDLING
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

---

**DECLARATION OF MATTHEW K. EDLING IN SUPPORT OF PLAINTIFF'S REPLY
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR APPOINTMENT
OF INTERIM LEAD COUNSEL**                                                    2

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CORTES COUNTRY STORES, INC,<br>d/b/a FREETOWN TRADING POST,<br>individually and on behalf of<br>all others similarly situated,<br>     Plaintiff,<br><br>v.<br><br>GANZ, INC.. and<br>GANZ USA, LLC.<br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No.

**PLAINTIFF'S FIRST COMPLAINT**

## INTRODUCTION

1.    Plaintiff, CORTES COUNTRY STORES, INC. d/b/a FREETOWN TRADING POST (referred to herein as the "FREETOWN TRADING POST") on behalf of all others similarly situated, brings this action under the Sherman Antitrust Act, the Clayton Antitrust Acts and common law breach of contract against Defendants GANZ, INC. and GANZ U.S.A., LLC (collectively referred to as "Ganz"). The action arises from GANZ's "tying" conduct in requiring retailers like the FREETOWN TRADING POST to purchase GANZ's "core product" (the "tied product") in order to purchase GANZ's incredibly popular "Webkinz" toys (the "tying product").

## PARTIES

2.    Plaintiff, CORTES COUNTRY STORES, INC. d/b/a FREETOWN TRADING POST is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business on Chase Road, East Freetown, Massachusetts. The FREETOWN

1

TRADING POST is a retail "country store" that sells items such as health and beauty aids, housewares, hard wares, pet supplies and "seasonal" and gift items.

3.    Defendant, GANZ, INC. is a corporation organized under the laws of Canada with a principal place of business at One Pearce Road, Woodbridge, Ontario, Canada. GANZ, INC. designs, produces, imports and sells toys and gift items. GANZ, INC. formulates and oversees marketing, distribution, and sales policies of GANZ products including "Webkinz."

4.    Defendant GANZ, U.S.A., LLC is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business in Cheektowaga, New York. GANZ U.S.A., LLC is a wholly-owed business unit of GANZ, INC.

5.    GANZ transacts business in the District of Massachusetts and throughout the nation.

## JURISDICTION AND VENUE

6.    The FREETOWN TRADING POST brings this action to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against GANZ for the injuries sustained by the FREETOWN TRADING POST and the members of the Class as a result of violations of the Sherman Act, 15 U.S.C. § 1.

7.    This Court has jurisdiction over the subject matter of this dispute under the provisions of Sections 1331, 1337 and 2201 of Title 28 of the United States Code, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

8.    This Court has jurisdiction over this dispute pursuant to the Class Action Fairness Act, 28 U.S.C. § 1132(d), in that Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, and the suit is

2

brought as a class action.

9.      This Court has jurisdiction over each of the Defendants by virtue of their

nationwide contacts and business activities, including their extensive contacts and business

activities in this district.

10.     Venue is proper in this Judicial District because at all relevant times, the

Defendants resided, transacted business, were found, or had agents in this District, and because a

substantial part of the events giving rise to the Plaintiff's claims occurred in this District.

Defendants transact a substantial amount of business in the District of Massachusetts, including

the sale of Webkinz and the tied Ganz core products.

## ALLEGATIONS COMMON TO ALL COUNTS

11.     "Webkinz" are plush toy stuffed animals originally released by GANZ in April

2005. Unlike other stuffed animals typically on the market, Webkinz toys come with a special

eight character code on their labels that allows a consumer (generally child consumers) to gain

access to "Webkinz World" (www.webkinz.com) which is a website maintained by GANZ.

Webkinz World allows the consumer to own a virtual version of the stuffed animal for virtual

interaction.

12.     When a consumer registers a Webkinz toy on the GANZ website, they "adopt"

and name the pet in the virtual Webkinz World which is an online play area with its own

economy. The user receives "money" known as "KinzCash" by adopting new pets, playing

online games, answering general knowledge questions, and through daily activities such as

clicking "I love my Webkinz" buttons with their computer "mouse," spinning the "Wheel of

WOW," or completing jobs available once every 8 hours. Each day, there is a "Game of the

Day" that can be played by the user for bonus "KinzCash" and other bonuses that are periodically available.

13.    In the Webkinz World, the user can actually create a virtual house for their Webkinz pets. Users can "spend" the KinzCash they acquire in the virtual world at the "W Shop" where they can buy food and clothing for their virtual pet and items for their pet's rooms in the virtual house. Users can even use KinzCash to build additional rooms to their pet's house or outdoor area.

14.    After initially introducing Webkinz, GANZ sold Webkinz primarily through its exisiting network of small retailers and gift shops like the FREETOWN TRADING POST. Webkinz pets generally retail for $11.00 to $15.00 depending on their popularity.

15.    In addition to Webkinz, GANZ also designs, produces, imports and sells toys and other gift items, "collectibles," "nick-knacks," seasonal decorations, candles, costume jewelry, lip gloss, key chains, candle votives, martini glasses and bottle stoppers. These products became referred to by GANZ as the "core product." GANZ was selling such core product for approximately 50 years before introducing Webkinz and prior to selling Webkinz was GANZ's only line of business.

16.    Prior to the first fiscal quarter of 2007, GANZ retailer-customers like the FREETOWN TRADING POST could order Webkinz from GANZ without being required to purchase the GANZ tied "core product."

## UNANNOUNCED OR DE FACTO TYING

17.    Prior to or during the first fiscal quarter of 2007, however, GANZ began to require existing retailer-customers like the FREETOWN TRADING POST to purchase a certain

4

dollar amount of the GANZ tied "core product" in order to be able to order Webkinz. The dollar amount of the order for the tied core-product was usually a percentage (10% or more) of the desired order for the tying product, Webkinz. If the retailer-customer did not order any of the GANZ tied "core product" then it could not order or would not receive any Webkinz that it ordered.

18.    In the first quarter of fiscal 2007, GANZ required the FREETOWN TRADING POST to order and purchase a certain percentage amount of tied core-product in order to continue to order and receive Webkinz. Even though the FREETOWN TRADING POST did not want to buy the tied core-product, or would rather have purchased such items on the open market for more competitive terms, it purchased the core-product in order to continue to receive the popular Webkinz.

19.    If a retailer, however, did not have an existing account with GANZ and wanted to become a GANZ retailer-customer, then GANZ required the prospective retailer to order a minimum amount of "core product" before allowing it to become eligible to order Webkinz. After placing a minimum order for the tied GANZ core-product, the retailer could then submit an application to GANZ to order Webkinz. Approval was not guaranteed. Through this co-ordering requirement, a retailer's ability to purchase the popular Webkinz product was conditioned on first purchasing a minimum amount of $1,000, and in some instances more, of the tied (and unwanted) core-product from GANZ. GANZ did not permit the retailer to return any of its tied core-product that the retailer could not sell. Thereafter, the requirement to buy core-product was based on a percentage of the dollar amount of the desired Webkinz order.

5

## ANNOUNCED TYING

20.     In the second fiscal quarter of 2007, GANZ announced to many of its retailer-customers that to order any more Webkinz, they would be required to attend a "trade-show" convention in Atlanta, Georgia, in July 2007. In response to GANZ's new demand, many retailer-customers including the FREETOWN TRADING POST incurred significant travel costs to attend the Atlanta trade-show so that they could continue purchasing Webkinz.

21.     During the Atlanta trade-show, GANZ formally announced its new "Webkinz Loyalty Program" under which GANZ created three tiers of retailer-customer preferred status for shipment and distribution of Webkinz. Under the new Program, retailer-customers were identified as "Gold," "Silver" or "Bronze" based upon the amount of core-product they order within a twelve month period. The greater the dollar value of core-product ordered, the greater the maximum number of Webkinz product a retailer was allowed to order.

22.     By establishing the new "Loyalty Program" that specifically created a priority shipping schedule based on a retailer-customer's preferred status, GANZ conditioned the sale of, and access to, Webkinz on the purchase of the tied core-product. Thus, GANZ was exploiting its control over the sale of Webkinz to force its retailer-customers, including the FREETOWN TRADING POST, into purchasing its line of tied core-products.

23.     In order to continue to receive Webkinz products, many of GANZ's retailer-customers, including the FREETOWN TRADING POST, ordered the tied core-product at the Atlanta trade show even though they did not want or need the tied core-products, or would have purchased such products elsewhere on different terms. Other retailer-customers after having incurred the expense to travel to Atlanta were informed by GANZ that they were not qualified to

6

order Webkinz under the new Loyalty Program or were required to order a significantly higher percentage of core-product before being able to place an order of Webkinz.

24.     Thereafter, GANZ promptly shipped the core-product orders to its retailer-customers, including the FREETOWN TRADING POST, but did not ship the Webkinz products as ordered and within the priority shipping time frames as agreed to and promised by GANZ.

25.     Further, when retailer-customers attempted to place orders for the more commercially desirable items of core-product, many of those items were unavailable. Nevertheless, the retailer-customer was still required by GANZ to order the commercially less-desirable core- product to continue to order Webkinz.

26.     At all times material herein, GANZ possessed, and continues to possess, sufficient power in the relevant product market to force the FREETOWN TRADING POST and members of the Class into this tying arrangement. GANZ also possessed, and continues to possess, sufficient power in the relevant product market to appreciably restrain competition in the market where the tied GANZ products compete.

27.     GANZ's manipulation of delivery of Webkinz orders exerted further market power over its retailers-customers including the FREETOWN TRADING POST because as part of its tying arrangement retailer-customers could not return core-product deliveries despite not having received Webkinz orders in a timely fashion. Thus, GANZ retailer-customers were irretrievably committed to the purchase of the unwanted tied core-product.

28.     The FREETOWN TRADING POST and the members of the purported Class have suffered monetary injury due to GANZ's actions of forcing them to order the tied GANZ core-product to gain access to Webkinz. GANZ's actions have also allowed it to reap wrongful

7

profits at the expense of its retailer-customers.

29.    The FREETOWN TRADING POST brings this action on behalf of all persons and entities in the United States who either were existing retailer-customers of GANZ or who established an account with GANZ and who ordered Webkinz from GANZ on the condition that they also order tied products from GANZ's line of "core-product."

30.    During the entire Class Period, GANZ sold Webkinz and the tied core-product in the United States in interstate commerce, the violations of law asserted herein have occurred in interstate commerce, and GANZ was able to foreclose a substantial amount of interstate commerce in the relevant markets of its tied and tying products.

### CLASS ALLEGATIONS

31.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23 (a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All retailer-customers of GANZ or retailers who established an account with GANZ in the United States from April 1, 2005 to the present that ordered Webkinz from GANZ on the condition that they also order products from GANZ's line of core-product.

32.    While the FREETOWN TRADING POST does not know the exact number of Class members nationwide, members of the purported Class number in at least the hundreds and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

33.    There are questions of law and fact common to the Class that include:

(a)    The existence of separate and distinct tying products and tied products;

(b)    The definition of the relevant product market for Webkinz;

(c)    That GANZ implemented an unlawful and illegal tying arrangement that

conditioned retailer-customers' ability to purchase Webkinz on their purchase of a specified, minimum dollar amount of the tied GANZ core-product in the United States in violation of Section 1 of the Sherman Anti-trust Act;

(d)     That GANZ had sufficient economic power in the relevant tying product market to appreciably coerce its retailer-customers to purchase its tied core-product;

(e)     That GANZ was able to foreclose a not insubstantial amount of interstate commerce in its tied core-product;

(f)     The FREETOWN TRADING POST and the other members of the Class were economically injured by reason of GANZ's unlawful conduct; and

(g)     The appropriate measure of damages sustained by the FREETOWN TRADING POST and other Class members.

34.     The FREETOWN TRADING POST's claims are typical of the claims of the Class members and it will fairly and adequately protect the interests of the Class. The FREETOWN TRADING POST purchased Webkinz from GANZ on the condition that it also purchase a specified minimum dollar amount of the tied GANZ core-product, and its interests are coincident with and not antagonistic to those of other members of the Class.

35.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

36.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because the individual class members are not all aware that they have been wronged and are thus unable to prosecute individual actions; concentration of the litigation concerning this matter in this Court is desirable; the claims of the FREETOWN TRADING

POST are typical of the claims of the members of the purported class; a failure of justice will result from the absence of a class action; and, the purported class and the difficulties likely to be encountered in the management of this class action are not great.

37.    Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint. This class action presents no difficulties in management that would preclude maintenance as a class action. Finally, the Class is readily definable and is one for which records of the names and addresses of the members of the Class exist in the files of GANZ.

38.    The FREETOWN TRADING POST will fairly and adequately protect the interests of all members of the purported Class in the prosecution of this action and in the administration of all matters relating to the claims stated herein. The FREETOWN TRADING POST is similarly situated with, and has suffered similar injuries as, the members of the purported class that it seeks to represent. The FREETOWN TRADING POST has been wronged, wishes to obtain redress of the wrong and wants GANZ stopped from perpetrating its scheme and continuing to profit from its illegal tying arrangement involving its core-product line. To that end, the FREETOWN TRADING POST has retained counsel experienced in complex class action cases. Neither the FREETOWN TRADING POST, nor its counsel, have any interest that may cause them to not vigorously pursue this action.

## GANZ'S RELEVANT PRODUCT MARKET

39.    According to the NPD Group, Inc. (a leading provider of consumer and retail industry information), in 2007 overall United States retail toy sales in all categories were

10

estimated to be $22.1 billion and $22.6 billion in 2006.

40.    The U.S. retail toy industry consists of multiple categories including: action figures & accessories; arts & crafts; building sets; dolls; games/puzzles; infant & preschool; learning & exploration; outdoor sports toys; plush toys; vehicles; and, all other toys. These categories contain further subcategories. For example, the "dolls" category contains four subcategories including "Nurturing Dolls & Accessories," "Fashion Themed Dolls/Figures & Accessories," "Playset Themed Figurines & Accessories," and "Display Dolls, Houses & Accessories." These subcategories are further subcategorized leaving the "dolls" category with over 10 subcategories.

41.    The "plush" toy category of the U.S. retail toy industry contains three subcategories: "Special Feature Plush," "Traditional Plush," and "Puppets."

42.    Further, according to the NPD Group, Inc. an emerging trend in the U.S. retail toy industry is the increase in sales of connected web play toys that marry a physical toy with ongoing digital play opportunities via the Internet. This growth is due "in large part to the popular Webkinz brand." ("U.S. Toy Industry Sales Generate $22 Billion in 2007," Thomson Reuters, Feb. 12, 2008).

43.    GANZ's Webkinz product line combines both a plush toy product with an online computer experience. Thus, the consumer who purchases a Webkinz stuffed animal has the option to play with the plush toy in the "real world," while at the same time to enter the online play area with its own economy using the character code and interact with his or her pet in the "virtual world." The relevant product market definition in the United States for Webkinz consists of the plush toy combined with an online gaming experience market.

11

44      A "virtual world" can be defined as a computer-based interactive simulated environment that can be accessed by multiple users through an online interface. Virtual worlds are sometimes also called "digital worlds," "simulated worlds," or "MMOGs." While there may be different types of virtual worlds, they generally share six features in common: (a) shared space in which the world allows multiple users to participate at once; (b) graphical user interface in which the world depicts space to the user visually; (c) immediacy in which the interaction takes place in "real time;" (d) interactivity in which the world allows users to alter, develop, build or otherwise submit customized content; (e) persistence in which the world's existence continues regardless of whether individual users are logged in; and (f) socialization/community in which the world allows or encourages interactions amongst users.

45.      To state that a virtual world requires a "real world" toy to participate online would be incorrect since many, if not most, virtual world games do not require a toy for a user to join the world. Thus, defining the relevant product market for purposes of this action as the virtual world market would be inaccurate and would result in an overly broad product market definition. Virtual worlds that do not require the purchase of a toy or other item for online access would not be reasonably interchangeable with plush toys combined with an online gaming experience.

46.      The "real world" Webkinz product that a consumer purchases in the "real world" is a soft stuffed animal that comes with its own online code. Based on its physical characteristics, the Webkinz product can be categorized as a plush toy. By its very nature a Webkinz product would not be categorized as an "action figure," a "doll," an "outdoor sports toy," or a "vehicle."

47.      Defining the relevant product market as plush toys combined with an online

12

gaming experience produces a set of products that are reasonably interchangeable. While there might be only a small number of possibly interchangeable products, defining the relevant product market as such still results in a level of reasonable interchangeability. Examples of other plush toys combined with an online gaming experience might include "Shining Stars" by Russ Berrie & Co., which consist of over 20 different plush stuffed animal toys that come with a code to enter the "Shining Stars" virtual world, or "Mushabellys" by Jay at Play a subsidiary of Jay Franco & Sons, Inc., which are plush toy animals and friendly-looking monsters that come with a code to unlock the "Mushabelly University" online world.

48.    In the event that the Court deems the "plush toy with online gaming" definition of relevant product market too narrow, the FREETOWN TRADING POST alleges in the alternative that the relevant product market could also be defined as toys combined with an online gaming experience. In either event, both definitions show a dominance of the relevant product market; in the event of plush toys with online gaming experience estimated to be 90% or more of the market share and in the event of toys with an online gaming experience estimated to be 80% or more of the market share.

## GANZ'S DOMINANCE IN THE RELEVANT PRODUCT MARKET

49.    Webkinz is an extremely popular product in the United States. In 2007, Webkinz was rated as the "coolest" toy brand by girls aged six to eleven, and as the third coolest toy brand by boys of same age. Girls also ranked Webkinz as the "coolest" brand overall, beating out major players like Barbie, High School Musical, Hannah Montana, and Abercrombie & Fitch (See *Playthings:* "Toys Still Tops With Kids – Barely – Kids share coolest brands heading into the holidays" Jan. 1, 2008).

50.    Webkinz sales have also been high.  Although GANZ does not regularly release sales figures, Anita Frazier of the NPD Group estimated that Webkinz revenues in the U.S. topped $45 million in 2006 and Webkinz sales revenues for 2007 have been estimated at $100 million.  The Webkinz world has been valued by one industry insider at $1.3 billion.  Over 21% of retailers surveyed told Toy Directory Monthly that Webkinz was their best selling item in 2007.

51.    By contrast, one of Webkinz's chief competitor, Russ Berrie's "Shining Stars," boasted $4 million in the second quarter of 2007, right after its introduction.

52.    The Webkinz online virtual world is one of the most visited websites aimed at children and teens.  In July 2007, Webkinz World had over 5 million unique visitors – more than any other virtual world and the most unique visitors among U.S. children ages 2 to 11.  GANZ's site traffic increased by over 175% from January to July of 2007.  Approximately one year later in March 2008, GANZ had nearly 12 million unique visitors access the Webkinz World site.  Other than the Apple iPhone, Webkinz was the fastest-growing online search term in the United States.

53.    The current competition for Webkinz consists chiefly of Russ Berrie's Shining Stars and Hasbro's Littlest Pet Shop VIPs.

54.    Littlest Pet Shop VIPs were just introduced in early 2008, and are not yet a consistent revenue source.

55.    Shining Stars boasts approximately 1 million registered users for its website (www.shiningstars.com); Webkinz consistenly has 5-6 times that many visitors to the Webkinz

World (www.webkinz.com).  Webkinz traffic is consistently much higher, and for June 2008 had almost 7 million visitors to Shining Star's approx. 125,000.

**COUNT I**
**DEFENDANTS' WRONGFUL CONDUCT AND ANTITRUST VIOLATIONS**

The FREETOWN TRADING POST repeats and reavers the allegations of paragraphs 1 through 56 as if realleged herein.

56.    Beginning in at least July 1, 2006, GANZ instituted a policy whereby persons or entities who did not have an account with GANZ and wanted to order Webkinz had to purchase a specific dollar amount (or percentage of the dollar amount) of the unwanted tied GANZ products.

57.    In addition to the co-ordering requirement, GANZ had a Loyalty Program for Webkinz retailers that gives priority shipping for ordering more than specified levels of "core products" within a twelve month period.  Also, the greater the dollar value of core products ordered, the greater the maximum number of Webkinz the retailer was allowed to order.

58.    GANZ forced retailers to order and purchase core-product if they wanted to sell Webkinz, even if they did not want the tied core products.

59.    GANZ's anti-competitive conduct is objectively baseless and motivated by a desire to restrict competition in the relevant market.  GANZ's tying arrangement has had the effect of restricting competition in the relevant product market and the markets for the tied products.

60.    The FREETOWN TRADING POST and the Class must order Webkinz directly from GANZ to ensure that they receive genuine Webkinz products.

61.    GANZ adopted and implemented these co-ordering policies and practices to preserve and extend its dominant position in the relevant product market.  These policies and

15

practices have made it more difficult for the FREETOWN TRADING POST and the Class to sell products that compete with Webkinz and/or the tied GANZ core-product. The FREETOWN TRADING POST and the Class were forced to stock limited retail shelf space with unwanted core-product, limiting their ability to sell competing products. GANZ's unlawful and illegal conduct has had the effect of restricting competition in the relevant product market and the markets for the GANZ tied-product. Meanwhile, GANZ's conduct has allowed it to maintain and increase its market share in those markets.

62. By using its power in the relevant product market to restrict competition in the markets for the tied core-product, GANZ artificially increased its revenues and profits from the tied GANZ core-product.

63. There is no legitimate reason for GANZ to require the FREETOWN TRADING POST and the Class to order GANZ's tied core-product to become eligible to sell Webkinz. GANZ's retailer-customers do not benefit from the arrangement, nor do consumers. GANZ, though, benefits from increased profits and revenues from GANZ's tied core-product. The tying arrangement illegally restricts competition and violates federal and state antitrust laws.

## THE FREETOWN TRADING POST AND THE CLASS SUFFERED ANTITRUST INJURY DUE TO GANZ'S CONDUCT

64. Through their unlawful acts, GANZ acted to the detriment of the FREETOWN TRADING POST and the Class members, resulting in GANZ reaping unlawful revenues and profits derived from GANZ's tied core-product.

65. The FREETOWN TRADING POST and the purported Class have been injured in their property and business as a direct and proximate result of GANZ's unlawful conduct. The FREETOWN TRADING POST and the Class have suffered monetary damages from being

coerced into purchasing unwanted GANZ tied core-product as a condition of purchasing Webkinz. GANZ's practices have forced the FREETOWN TRADING POST and the Class to purchase and stock unwanted items that take up valuable retail shelf space. This shelf space could be used for products that compete against Webkinz and/or GANZ's tied core-product.

66.     Through its co-ordering requirement, GANZ has conditioned the sale of Webkinz (the "tying product") to the order of the tied GANZ core-product (the "tied product"). GANZ has sold Webkinz to the FREETOWN TRADING POST and the Class on the condition that they also order the tied GANZ core-product.

67.     Webkinz, the tying product, is separate and distinct from GANZ's tied core-product. Demand for the two products is separate. Thus, there is sufficient commercial demand for each product separately that it is economically efficient to offer the two products separately.

68.     GANZ has used its power in the relevant product market to force the FREETOWN TRADING POST and members of the purported Class to purchase GANZ's tied core-product in order to sell Webkinz.

69.     GANZ has sufficient economic power in the United States market for plush toys combined with an online gaming experience to enable it to restrain trade appreciably in the markets where the tied GANZ products compete. GANZ's tying arrangement has been successful and affects a substantial volume of trade and commerce. GANZ has been able to force the FREETOWN TRADING POST and the members of the purported Class to order the tied core-product if they want to order Webkinz. Had GANZ not imposed the tying arrangement, the FREETOWN TRADING POST and the members of the purported Class would not have

17

ordered the tied GANZ core-product, or would have ordered a smaller amount than GANZ forced them to order.

70.    GANZ has a financial interest in the sale of the tied core-product so as to increase sales and its share in the markets where the tied GANZ core-product compete.

71.    GANZ's tying arrangement has harmed competition and foreclosed a substantial amount of interstate commerce in the markets where the tied GANZ products compete.

72.    GANZ's tying arrangement has caused monetary injury to the FREETOWN TRADING POST and the Class.

73.    GANZ's tying arrangement is objectively baseless and subjectively motivated by a desire to restrict competition. The tying arrangement imposes excessive burdens, and any legitimate business purposes could be accomplished by less restrictive means.

74.    The tying arrangement constitutes a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14).

## COUNT II
## BREACH OF CONTRACT

The FREETOWN TRADING POST repeats and reavers the allegations of paragraphs 1 through 75 as if realleged herein.

75.    During the relevant Class period, the FREETOWN TRADING POST, and the members of the purported Class that it seeks to represent, entered into contractual agreements with GANZ in which they ordered both GANZ core-product and Webkinz.

76.    Under the terms of the agreements with the FREETOWN TRADING POST, and the members of the purported Class that it seeks to represent, GANZ agreed to deliver both the core-product and the Webkinz in a commercially timely manner.

77. During the relevant Class period, GANZ breached its contractual agreements with the FREETOWN TRADING POST and the members of the Class that it seeks to represent, by: failing to deliver Webkinz orders in a commercially timely manner and by breaching the duty of good faith and fair dealing in accepting orders for both tied core-product and Webkinz from retailer-customers while reasonably knowing that it would not be able to deliver orders of Webkinz in a commercially timely manner or to deliver Webkinz orders at all.

78. As a direct and proximate result of GANZ's breach of contract, the FREETOWN TRADING POST and the members of the Class that it seeks to represent have been damaged.

## PRAYER FOR RELIEF

WHEREFORE, the FREETOWN TRADING POST, on behalf of itself and the Class it seeks to represent, pray for relief as follows:

a. That the Court declare and decree that GANZ's acts, conduct, and practices are unlawful under Section 1 of the Sherman Act (15 U.S.C. § 1), Section 3 of the Clayton Act (15 U.S.C. § 14), and constitute a breach of contract;

b. That the Court permanently enjoin GANZ, as well as its officers, agents, servants, employees, and attorneys who shall receive actual notice of the Court's injunction, from continued engagement of those acts, forms of conduct and practices found to be illegal, as provided by Section 16 of the Clayton Act (15 U.S.C. § 26; *see also* 15 U.S.C. § 4);

c. That the Court award the FREETOWN TRADING POST and the members of the Class it seeks to represent threefold their actual antitrust damages sustained as a result

19

of GANZ's antitrust violations, as provided by Section 4 of the Clayton Act (15 U.S.C. § 15);

d.  That the Court award the FREETOWN TRADING POST and the Class reasonable attorneys' fees and costs as provided by Section 4 of the Clayton Act (15 U.S.C. § 15) and the common fund doctrine;

e.  That the Court award the FREETOWN TRADING POST and the Class damages for breach of contract against GANZ;

f.  That the Court award the FREETOWN TRADING POST and members of the Class pre-judgment and post-judgment interest as permitted by the law;

g.  The Court award the FREETOWN TRADING POST and members of the Class such other and further relief at law or in equity as the Court may deem just and proper.

THE PLAINTIFF REQUESTS AND DEMANDS A TRIAL BY JURY

Respectfully submitted,

On behalf of the Plaintiff and the Class

Andrew J. Garcia, MA BBO#559084
agarcia@phillipsgarcia.com
Carlin J. Phillips
cphillips@phillipsgarcia.com
PHILLIPS & GARCIA, PC
13 Ventura Drive
Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 (facsimile

Paul G. Hamel
paulhamel@comcast.net
c/o 13 Ventura Drive
Dartmouth, MA 02747
(774) 263-1756

20

Arthur S. Gold
asg@gcjustice.com
GOLD & COULSON
A Partnership of Professional
and Limited Liability Corporations
11 S. LaSalle St., Suite 2402
Chicago, IL 60603
312.372.0777
312.372.0778 (facsimile)

21

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**SCOTT AND SHERRI COMSTOCK,**
**d/b/a THE CHESHIRE CAT and THE**
**SPOTTED CROCODILE,**
**Plaintiffs,**

v.

**GANZ, INC. and GANZ USA, LLC,**
**Defendants.**

```
FILED: JULY 22, 2008
08CV4167
JUDGE KOCORAS
MAGISTRATE JUDGE SCHENKIER
TG
```

Case No._____
**JURY DEMAND**

## CLASS ACTION COMPLAINT

NOW COME Plaintiffs, SCOTT COMSTOCK AND SHERRI COMSTOCK

d/b/a THE CHESHIRE CAT and THE SPOTTED CROCODILE, through their attorneys,

GOLD & COULSON, a partnership of professional and limited liability corporations,

Phillips & Garcia, P.C., and Paul Hamel, and complain as follows with respect to

Defendants GANZ, INC. and GANZ USA, LLC:

## INTRODUCTION

1.     Plaintiffs, husband and wife, SCOTT COMSTOCK AND SHERRI COMSTOCK

("THE COMSTOCKS") d/b/a THE CHESHIRE CAT and THE SPOTTED

CROCODILE on behalf of all others similarly situated, bring this action under the

Sherman Act, the Clayton Act, and for breach of contract against Defendants GANZ,

INC. and GANZ USA, LLC (collectively referred to as "Ganz").  This action arises from

Ganz's tying conduct in requiring retailers like THE COMSTOCKS to purchase Ganz's

"core product" (the "tied" product) in order to purchase Ganz's incredibly popular

Webkinz plush toys (the "tying" product).

1

## PARTIES

2.      The COMSTOCKS are the sole proprietors of THE CHESHIRE CAT and THE

SPOTTED CROCODILE, with their principal place of business in Grayslake, Illinois.  In

their two connected shops, they sell gifts, toys, jewelry, handbags, candles, bath products,

and other various items and collectibles.

3.      Defendant GANZ, INC. is a corporation organized and existing under the laws of

Canada with its principal place of business at One Pearce Road, Woodbridge, Ontario,

Canada.  GANZ, INC. designs, produces, imports, and sells toys and gift items.  GANZ,

INC. formulates and oversees the marketing, distribution, and sales policies of Ganz

products, including Webkinz.

4.      Defendant GANZ USA, LLC is a limited liability company organized and

existing under the laws of the State of Delaware, with its principal place of business in

Cheektowaga, New York.  GANZ USA, LLC is a wholly-owned business unit of GANZ,

INC.

5.      Ganz transacts business in the Northern District of Illinois and throughout the

nation.

## JURISDICTION AND VENUE

6.      THE COMSTOCKS bring this action to obtain injunctive relief and to recover

treble damages and the costs of this suit, including reasonable attorneys' fees, against

Ganz for injuries sustained by THE COMSTOCKS and the members of the Class as a

result of violations of the Sherman Act, 15 U.S.C. § 1.

7.      This Court has jurisdiction over the subject matter of this dispute under the provisions of Sections 1331, 1337, and 2201 of Title 28 of the United States Code, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

8.      This Court has jurisdiction over this dispute pursuant to the Class Action Fairness Act, 28 U.S.C. § 1132(d), in that Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $5,000,000.00 exclusive of interests and costs, and the suit is brought as a class action.

9.      The Court has jurisdiction over each of the Defendants by virtue of their nationwide contacts and business activities, including their extensive contacts and business activities in this District.

10.     Venue is proper in this District because at all relevant times, Defendants resided, transacted business, were found, or had agents in this District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.  Defendants transact a substantial amount of business in the Northern District of Illinois, including the sale of Webkinz and the tied Ganz core products.

## ALLEGATIONS COMMON TO ALL COUNTS

11.     Webkinz are plush toy stuffed animals originally released by Ganz in April, 2005. Webkinz is both a toy and an online game. Unlike other stuffed toys typically on the market, Webkinz toys come with a special eight character code on their labels that allow a consumer (generally child consumers) to gain access to "Webkinz World" (www.webkinz.com), which is a website maintained by Ganz. Webkinz World allows the consumer to own a virtual version of the stuffed animal for virtual interaction.

3

12.     When a consumer registers a Webkinz toy on the Ganz website, they "adopt" and name the pet in the virtual Webkinz World, which is an online play area with its own economy. The user receives "money" known as "KinzCash" by adopting new pets, playing online games, answering general knowledge questions, and through daily activities such as clicking "I love my Webkinz" buttons with their computer "mouse," spinning the "Wheel of WOW," or completing jobs available once every 8 hours. Each day, there is a "Game of the Day" that can be played by the user for bonus "KinzCash" and other bonuses that are periodically available.

13.     In the Webkinz World, the user can actually create a virtual house for their Webkinz pets. Users can "spend" the KinzCash they acquire in the virtual world at the "W Shop" where they can buy food and clothing for their virtual pet and items for their pet's rooms in the virtual house. Users can even use KinzCash to build additional rooms to their pet's house or outdoor area.

14.     After initially introducing Webkinz, Ganz sold Webkinz exclusively through its established retailers, mostly small "Mom and Pop" retailers and gift shops like THE CHESHIRE CAT and THE SPOTTED CROCODILE. Webkinz pets generally retail for between $11.00 and $15.00, depending on their popularity. The initial retail price was between $7.95 and $9.95.

15.     In addition to Webkinz, Ganz also designs, produces, imports, and sells toys and other gift items, "collectibles," "knick-knacks," seasonal decorations, candles, costume jewelry, lip gloss, key chains, candle votives, martini glasses, and bottle stoppers. These products became referred to by Ganz as "core products." The "core products" are not

4

necessary for the use of the Webkinz and, indeed, are unrelated to the Webkinz other than being distributed by GANZ, INC.

16.    Prior to the first fiscal quarter of 2007, Ganz retailer-customers could order Webkinz from Ganz without being required to purchase the tied Ganz "core products."

## UNNANOUNCED OR DE FACTO TYING

17.    Sometime prior to or during the first fiscal quarter of 2007, however, Ganz began to require existing retailer-customers to purchase the Ganz tied "core product" in order to be able to order Webkinz. The dollar amount of the order for the tied core product was usually a percentage (10% or more) of the desired order for the tying product, Webkinz. If the retailer-customer did not order any of the GANZ tied "core product" then he would not receive any Webkinz that he ordered.

18.    Similarly, if a retailer like THE CHESHIRE CAT or THE SPOTTED CROCODILE did not have an existing account with Ganz, it was required to order a minimum amount of "core products" before becoming eligible to order Webkinz. (THE COMSTOCKS had to place an initial order of $500 or $1,000 of core products before being allowed to order Webkinz). After placing the minimum order for the tied Ganz products, the retailer could then submit an application to Ganz to order Webkinz. Approval was not guaranteed.  Through this co-ordering requirement, a retailer's ability to purchase the popular Webkinz product was conditioned on first purchasing a certain amount (minimum $1,000.00 and in some instances more) of the tied (and unwanted) Ganz "core products."  Ganz did not permit the retailer to return any of the tied Ganz products that it does not sell.  Thereafter, the requirement to buy core products was based on a percentage of the dollar amount of the desired Webkinz order.

19.     As to THE COMSTOCKS, they set up an account with Ganz in order to become

eligible to purchase Webkinz. A Ganz sales representative told THE COMSTOCKS that

they needed to establish credit with Ganz, and suggested they send $20,000.00 to avoid

credit delays with shipping Webkinz. THE COMSTOCKS, wanting to be able to order

the incredibly popular Webkinz, placed orders for core products, along with thousands of

dollars of orders for Webkinz (See Ex. A attached). However, THE COMSTOCKS only

received from GANZ the core product, much of which they didn't order. They did not

receive Webkinz as part of these orders. Only after paying this initial $20,000.00

requirement did THE COMSTOCKS receive Webkinz from Ganz.

## ANNOUNCED TYING

20.     In the second fiscal quarter of 2007, Ganz announced to many of its retailer-

customers that to order any newly-announced Webkinz clothes, they would be required to

attend a "trade-show" convention in Atlanta, Georgia, in July 2007. In response to

Ganz's new demand, many retailer-customers, including THE COMSTOCKS, incurred

significant travel costs to attend the Atlanta trade-show so that they could purchase and

receive Webkinz clothes when they were released.

21.     During the Atlanta trade-show, Ganz formally announced its new "Webkinz

Loyalty Program" under which Ganz created three tiers of retailer-customer preferred

status for shipment and distribution of Webkinz. Under the new Program, retailer-

customers were identified as "Gold," "Silver" or "Bronze" based upon the amount of core

product they order within a twelve month period. Worse yet, most previous orders did

not count towards the program.

22.    The Ganz Loyalty Program for Webkinz retailers gives priority shipping for ordering more than specified levels of the "core products" within a twelve month period. Also, the greater the dollar value of "core products" ordered, the greater the maximum number of Webkinz products a retailer is allowed to order.

23.    By establishing the new "Loyalty Program" that specifically created a priority shipping schedule based on a retailer-customer's preferred status, Ganz conditioned the sale of, and access to, Webkinz on the purchase of the tied core product. Thus, Ganz was exploiting its control over the sale of Webkinz to force retailer-customers, including THE COMSTOCKS, into purchasing its line of tied core products.

24.    In order to continue to receive Webkinz products, many of Ganz's retailer-customers ordered tied core products at the Atlanta trade show even though they did not want or need the tied core products, or would have purchased such products elsewhere on different terms.

25.    Thereafter, Ganz shipped voluminous amounts of un-wanted core product, that were not even ordered, to THE COMSTOCKS, along with Webkinz products as ordered.

26.    At all times material herein, Ganz knew, or reasonably should have known, that it could not and would not timely fill Webkinz orders within the priority shipping time frames as agreed to and promised by Ganz.[1]

27.    At all relevant times, Ganz possessed, and continues to possess sufficient power in the relevant product market to force THE COMSTOCKS and members of the Class into this tying arrangement.  Ganz also possessed, and continues to possess, sufficient

---

[1]    The "priority shipping time" is just that many of the Webkinz are season oriented such as for Halloween, Christmas, etc.

power in the relevant product market to appreciably restrain competition in the market in which the tied Ganz products compete.

28.     Ganz's manipulation of delivery of Webkinz orders exerted further market power over its retailer-customers, including THE COMSTOCKS, because as part of its tying arrangement, retailer-customers could not return core product deliveries despite not having received Webkinz orders in a timely fashion.  Thus, Ganz retailer-customers were irretrievably committed to the purchase of the tied core products.

29.     THE COMSTOCKS and the members of the putative Class have suffered monetary injury due to Ganz's actions of forcing them to order the tied Ganz core product to gain access to Webkinz.  Ganz's actions have also allowed it to reap and retain wrongful profits at the expense of its retailer-customers.

30.     THE COMSTOCKS bring this action on behalf of all persons and entities in the United States who either were existing retailer-customers of Ganz or who established an account with Ganz and who ordered Webkinz from Ganz on the condition that they also order tied products from Ganz's line of "core products."

31.     During the relevant time period, Ganz sold Webkinz and the tied Ganz products in interstate commerce.  The violations of law asserted herein have occurred in interstate commerce, and Ganz was able to foreclose a substantial amount of interstate commerce in both the relevant market and the markets in which the tied Ganz products compete.

## CLASS ALLEGATIONS

32.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

All existing retailer-customers of Ganz or retailers who established an account with Ganz in the United States from April 1, 2005 to the present that ordered Webkinz from Ganz on the condition that they also order products from Ganz's line of core-product.

33.    While THE COMSTOCKS do not know the exact number of Class members, members of the purported Class number in at least the hundreds and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

34.    There are questions of law and fact common to the Class.  They include but are not limited to:

a.    The existence of separate and distinct tying products and tied products;

b.    The definition of the relevant product market for Webkinz;

c.    Whether Ganz implemented an unlawful and illegal tying arrangement that conditioned retailers' ability to purchase Webkinz on their purchase of a specified, minimum dollar amount of the tied Ganz products in the United States in violation of Section 1 of the Sherman Act;

d.    That Ganz had sufficient economic power in the relevant tying product market to appreciably coerce its retailer-customers to purchase its tied core products;

e.    Whether THE COMSTOCKS and other Class members were economically injured by reason of Ganz's unlawful and illegal conduct;

f.    The appropriate measure of damages sustained by THE COMSTOCKS and other Class members.

35.     THE COMSTOCKS' claims are typical of the claims of the Class members and they will fairly and adequately protect the interests of the Class. THE COMSTOCKS purchased Webkinz from Ganz on the condition that they also purchase a specified minimum dollar amount of the tied Ganz core products, and their interests are coincident and not antagonistic to those of the other Class members.

36.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

37.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because the individual Class members are not all aware that they have been wronged and are thus unable to prosecute individual actions; concentration of the litigation concerning this matter in this Court is desirable; the claims of the THE COMSTOCKS are typical of the claims of the members of the purported class; a failure of justice will result from the absence of a class action; and, the purported class and the difficulties likely to be encountered in the management of this class action are not great.

38.     Class treatment will also permit the adjudication of many relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim like the one asserted in this Complaint. This class action presents no difficulties in management that would preclude maintenance as a class action. Finally, the Class is readily definable and is one for which records of the names and addresses of Class members exist in Ganz's files.

39.     THE COMSTOCKS will fairly and adequately protect the interests of all members of the putative Class in the prosecution of this action and in the administration of all matters relating to the claims stated herein. THE COMSTOCKS are similarly

situated with, and have suffered similar injuries as, the members of the putative class they seek to represent. THE COMSTOCKS have been wronged, wish to obtain redress of the wrong and want Ganz stopped from perpetrating its scheme and continuing to profit from its illegal tying arrangement involving its core product line. To that end, THE COMSTOCKS have retained counsel experienced in complex class action cases. Neither THE COMSTOCKS, nor their counsel, have any interest that may cause them to not vigorously pursue this action.

## GANZ'S RELEVANT PRODUCT MARKET

40.    According to the NPD Group, Inc. (a leading provider of consumer and retail industry information), in 2007 overall United States retail toy sales in all categories were estimated to be $22.1 billion, and $22.6 billion in 2006.

41.    The U.S. retail toy industry consists of multiple categories including: action figures & accessories; arts & crafts; building sets; dolls; games/puzzles; infant & preschool; learning & exploration; outdoor sports toys; plush toys; vehicles; and, all other toys. These categories contain further subcategories. For example, the "dolls" category contains four subcategories including "Nurturing Dolls & Accessories," "Fashion Themed Dolls/Figures & Accessories," "Playset Themed Figurines & Accessories," and "Display Dolls, Houses & Accessories." These subcategories are further subcategorized leaving the "dolls" category with over 10 subcategories.

42.    The "plush" toy category of the U.S. retail toy industry contains three subcategories: "Special Feature Plush," "Traditional Plush," and "Puppets."

43.    Further, according to the NPD Group, Inc., an emerging trend in the U.S. retail toy industry is the increase in sales of connected web play toys that marry a physical toy

with ongoing digital play opportunities via the Internet. This growth is due "in large part
to the popular Webkinz brand." ("U.S. Toy Industry Sales Generate $22 Billion in 2007,"
Thomson Reuters, Feb. 12, 2008).

44.     GANZ's Webkinz product line combines both a plush toy product with an online
computer experience. Thus, the consumer who purchases a Webkinz stuffed animal has
the option to play with the plush toy in the "real world," while at the same time entering
the online play area with its own economy, using the character code, and interact with his
or her pet in the "virtual world." The relevant product market definition in the United
States for Webkinz is: the plush toy combined with an online gaming experience market.

45.     A "virtual world" can be defined as a computer-based interactive simulated
environment that can be accessed by multiple users through an online interface. Virtual
worlds are sometimes also called "digital worlds," "simulated worlds," or "MMOGs."
While there may be different types of virtual worlds, they generally share six features in
common: (a) shared space in which the world allows multiple users to participate at once;
(b) graphical user interface in which the world depicts space to the user visually; (c)
immediacy in which the interaction takes place in "real time"; (d) interactivity in which
the world allows users to alter, develop, build or otherwise submit customized content;
(e) persistence in which the world's existence continues regardless of whether individual
users are logged in; and (f) socialization/community in which the world allows or
encourages interactions amongst users.

46.     To state that a virtual world requires a "real world" toy to participate online would
be incorrect since many, if not most, virtual world games do not require a toy for a user to
join the world. Thus, defining the relevant product market for purposes of this action as

the virtual world market would be inaccurate and would result in an overly broad product market definition. Virtual worlds that do not require the purchase of a toy or other item for online access would not be reasonably interchangeable with plush toys combined with an online gaming experience.

47.     The "real world" Webkinz product that a consumer purchases in the "real world" is a soft stuffed animal that comes with its own online code. Based on its physical characteristics, the Webkinz product can be categorized as a plush toy. By its very nature a Webkinz product would not be categorized as an "action figure," a "doll," an "outdoor sports toy," or a "vehicle."

48.     Defining the relevant product market as plush toys combined with an online gaming experience produces a set of products that are reasonably interchangeable. While there might be only a small number of possibly interchangeable products, defining the relevant product market as such still results in a level of reasonable interchangeability. Examples of other plush toys combined with an online gaming experience might include "Shining Stars" by Russ Berrie & Co., which consist of over 20 different plush stuffed animal toys that come with a code to enter the "Shining Stars" virtual world, or "Mushabellys" by Jay at Play, a subsidiary of Jay Franco & Sons, Inc., which are plush toy animals and friendly-looking monsters that come with a code to unlock the "Mushabelly University" online world.

## GANZ'S DOMINANCE IN THE RELEVANT MARKET

49.     Webkinz is an extremely popular product in the United States. In 2007, Webkinz was rated as the "coolest" toy brand by girls aged six to eleven, and as the third coolest toy brand by boys of the same age. Girls also ranked Webkinz as the "coolest" brand

overall, beating out major players like Barbie, High School Musical, Hannah Montana, and Abercrombie & Fitch  (See *Playthings*: "Toys Still Tops With Kids – Barely – Kids share coolest brands heading into the holidays" January 1, 2008, attached as Ex. B).

50.    Webkinz sales have also been high.  Although Ganz does not regularly release sales figures, Anita Frazier of the NPD Group estimated that Webkinz revenues in the U.S. topped $45 million in 2006.  Webkinz sales revenues for 2007 have been estimated at $100 million (See Ex. C attached).  The Webkinz world has been valued by one industry insider at $2 billion (See Ex. D attached).  Over 21% of retailers surveyed told Toy Directory Monthly that Webkinz was their best selling item in 2007  (See Ex. E attached).

51.    By contrast, Webkinz's chief competitor, Shining Stars, boasted just $4 million in sales in the second quarter of 2007, right after its introduction, according to investors.

52.    The Webkinz site is one of the most visited websites aimed at children and teens. In July 2007, the Webkinz site had over 5 million unique visitors – more than any other virtual world.  As of July 2007, the Webkinz site had the most unique visitors among U.S. children ages 2 to 11 of any website.  Webkinz's site traffic increased by over 175% from January to July of 2007.  In March of 2008, nearly 12 million unique visitors accessed the Webkinz site.  Other than the Apple iPhone, Webkinz was the fastest-growing online search term in the United States.

53.    The current competition for Webkinz consists chiefly of Russ Berrie & Co.'s Shining Stars and Hasbro's Littlest Pet Shop VIPs.

54.    Littlest Pet Shop VIPs were just introduced in early 2008, and are not yet a consistent revenue source.

55.    Shining Stars boasts approximately 1 million registered users for its website (www.shiningstars.com); Webkinz consistently has 5-6x that many visitors to the Webkinz World (www.webkinz.com). Attached as Ex. F is a graph comparing online traffic to the Webkinz World and the Shining Stars website over the last year, a key indicator of success for a toy that combines real world play and online gaming. Webkinz traffic is consistently much higher, and for June 2008 had almost 7 million visitors to Shining Stars' approximately 125,000.

## GANZ'S WRONGFUL CONDUCT AND ANTITRUST VIOLATIONS

56.    Beginning in at least July 1, 2006, Ganz instituted a policy whereby persons or entities who did not have an account with Ganz and wanted to order Webkinz had to purchase approximately $1,000 of the unwanted tied Ganz products.

57.    In addition to the co-ordering requirement, Ganz has a Loyalty Program for Webkinz retailers that gives priority shipping for ordering more than specified levels of "core products" within a twelve month period. Also, the greater the dollar value of core products ordered, the greater the maximum number of Webkinz the retailer was allowed to order (See Ex. G attached).

58.    Ganz forced retailers to order and purchase core products if they wanted to sell Webkinz, even if they did not want the tied core products.

59.    Ganz's anti-competitive conduct is objectively baseless and motivated by a desire to restrict competition in the relevant market. Ganz's tying arrangement has had the effect of restricting competition in the relevant product market and the markets for the tied products.

60.    Plaintiffs and the Class must order Webkinz directly from Ganz to ensure that they receive genuine Webkinz products.

15

61.     Ganz adopted and implemented these co-ordering policies and practices to preserve and extend its dominant position in the relevant market. These policies and practices have made it more difficult for Plaintiffs and the Class to sell products that compete with Webkinz and/or the tied Ganz products. Plaintiffs and the Class are forced to stock limited retail shelf space with unwanted core products, limiting their ability to sell competing products. Ganz's unlawful and illegal conduct has had the effect of restricting competition in the relevant market and the markets for the tied Ganz products. Meanwhile, Ganz's conduct has allowed it to maintain and increase its market share in those markets.

62.     By using its power in the relevant market to restrict competition in the markets for the tied products, Ganz artificially increased its revenues and profits from the tied Ganz products.

63.     There is no legitimate reason for Ganz to require Plaintiffs and the Class to order the tied Ganz products to become eligible to sell Webkinz. Ganz's customers do not benefit from the arrangement. Ganz does benefit from increased profits and revenues from the tied Ganz products. The tying arrangement illegally restricts competition and violates federal antitrust laws.

## THE COMSTOCKS AND THE CLASS SUFFERED ANTITRUST INJURY DUE TO GANZ'S CONDUCT

64.     Through their unlawful acts, Ganz acted to the detriment of Plaintiffs and Class members, resulting in Ganz reaping unlawful revenues and profits derived from the tied Ganz products.

65.     Plaintiffs and the Class have been injured in their property and business as a direct and proximate result of Ganz's unlawful conduct. Plaintiff and the Class have suffered

monetary damages from being coerced into purchasing unwanted tied Ganz products as a condition of purchasing Webkinz. Ganz's practices have forced Plaintiffs and the Class to purchase and stock unwanted items that take up valuable retail shelf space. This shelf space could be used for products that compete against Webkinz and/or the tied Ganz products.

66.    As to THE COMSTOCKS, approximately 40% of their limited shelf space is occupied with unwanted Ganz core products. This shelf space could be otherwise used for products that compete with Webkinz and/or the tied Ganz core products; products that actually sell.

## VIOLATIONS ALLEGED

67.    Plaintiffs incorporate by reference all the allegations set forth above as if fully set forth herein.

68.    Through its co-ordering requirement, Ganz has conditioned the sale of Webkinz (the "tying product") to the order of the tied Ganz core products (the "tied product"). Ganz has sold Webkinz to THE COMSTOCKS and the Class on the condition that they also order the tied Ganz products.

69.    The tying product (Webkinz) is separate from the tied product (the Ganz core products). Demand for the two products is separate; there is sufficient demand for each product separately that it is economically efficient to offer the two products separately.

70.    Ganz has used its power in the relevant product market to force THE COMSTOCKS and members of the putative Class to purchase the tied Ganz products in order to sell Webkinz.

17

71.     Ganz has sufficient economic power in the United States market for plush toys combined with online gaming to enable it to restrain trade appreciably in the markets where the tied Ganz products compete. Ganz's tying arrangement has been successful and affects a substantial volume of trade and commerce. Ganz has been able to force THE COMSTOCKS and Class members to order the tied products if they want to order Webkinz. Had Ganz not imposed the tying arrangement, THE COMSTOCKS and many Class members would not have ordered the tied Ganz products, or would have ordered a much smaller amount than Ganz forced them to order.

72.     Ganz has a financial interest in the sale of the tied products so as to increase sales and its share in the markets where the tied Ganz products compete.

73.     Ganz's tying arrangement has harmed competition and foreclosed a substantial amount of interstate commerce in the markets where the tied Ganz products compete.

74.     Ganz's tying arrangement has caused monetary injury to Plaintiffs and the Class.

75.     Ganz's tying arrangement is objectively baseless and subjectively motivated by a desire to restrict competition. The tying arrangement imposes excessive burdens, and any legitimate business purposes could be accomplished by less restrictive means.

76.     The tying arrangement constitutes a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 3 of the Clayton Act (15 U.S.C. § 14).

## COUNT II - BREACH OF CONTRACT

THE COMSTOCKS repeat and reaver the allegations of paragraphs 1 through 76 as if realleged herein.

77.     During the relevant Class period, THE COMSTOCKS, and the members of the putative Class that they seek to represent, entered into contractual agreements with Ganz in which they ordered both Ganz core products and Webkinz.

18

**78.** Under the terms of the agreements with the THE COMSTOCKS, and the members of the putative Class they seek to represent, Ganz agreed to deliver both the core-product and the Webkinz in a commercially timely manner.

79. During the relevant Class period, Ganz breached its contractual agreements with THE COMSTOCKS and the members of the Class they seek to represent, by: failing to deliver Webkinz orders in a commercially timely manner and by breaching the duty of good faith and fair dealing in accepting orders for both tied core products and Webkinz from retailer-customers while reasonably knowing that it would not be able to deliver orders of Webkinz in a commercially timely manner or deliver Webkinz orders at all.

80. As a direct and proximate result of Ganz's breach of contract, THE COMSTOCKS and the members of the Class they seek to represent have been damaged.

### PRAYER FOR RELIEF

WHEREFORE, THE COMSTOCKS, on behalf of themselves and the Class, pray for relief as follows:

a. The Court declare and decree that Ganz's acts, conduct, and practices are unlawful under Section 1 of the Sherman Act (15 U.S.C. § 1), Section 3 of the Clayton Act (15 U.S.C. § 14), and constitute breach of contract;

b. The Court permanently enjoin Ganz, as well as its officers, agents, servants, employees, and attorneys who shall receive actual notice of the Court's injunction, from continued performance of those acts, forms of conduct and practices found to be illegal, as provided by Section 16 of the Clayton Act (15 U.S.C. § 26; *see also* 15 U.S.C. § 4);

   **c.** The Court award THE COMSTOCKS and the members of the Class threefold their actual antitrust damages sustained as a result of Ganz's antitrust violations, as provided by Section 4 of the Clayton Act (15 U.S.C. § 15);

   **d.** The Court award THE COMSTOCKS and the Class reasonable attorneys' fees and costs as provided by Section 4 of the Clayton Act (15 U.S.C. § 15) and the common fund doctrine;

   **e.** The Court award THE COMSTOCKS and members of the Class pre-judgment and post-judgment interest as permitted by the law;

   **f.** The Court award Plaintiffs and members of the Class such other and further relief at law or in equity as the Court may deem just and proper.

Respectfully submitted,

_/s/ Arthur S. Gold_
one of their counsel

Arthur S. Gold
Gold & Coulson
A Partnership of Professional
and Limited Liability Corporations
11 S. LaSalle St., Suite 2402
Chicago, IL 60603
312.372.0777
312.372.0778 (facsimile)

Phillips & Garcia, P.C.
13 Ventura Drive
Dartmouth, MA 02747
(508) 998-0800, ext. 111
(508) 998-0919 facsimile

Paul Hamel, Esq.
c/o 13 Ventura Drive
Dartmouth, MA 02747
(774) 263-1756

08CV4167 Case 3:08-cv-02873-JSW    Document 36-3    Filed 08/15/2008    Page 21 of 44
       Case 1:08-cv-0    7    Document 1-2    Filed 07/22/    Page 1 of 24
JUDGE KOCORAS
MAGISTRATE JUDGE SCHENKIER
TG

# EXHIBIT A

Case 3:08-cv-02873-JSW    Document 36-3    Filed 08/15/2008    Page 22 of 44
Case 1:08-cv-0    Document 1-2    Filed 07/22/2    Page 2 of 24

Page 1 of 1

# CheckManager *Plus*™

Account:      335100945                                07/03/08

Name:        THE CHESHIRE CAT LTD

Address:      34121 N RT 45

              GRAYSLAKE, IL 600300000

The image shown below represents an official copy of the original document as processed by our institution



013530    02/28/07    4060260    20000.00



# EXHIBIT B



Just a click away ...

« Back | Print

## Toys Still Tops With Kids—Barely

### Kids share coolest brands heading into holidays

*By Nancy Zwiers – Playthings, 1/1/2008*

Think kids are growing older, younger? That may be the case. A recent survey conducted by kids marketing firm Funosophy asked more than 800 kids, boys and girls ages 6 to 11, to share the coolest brands they were buying heading into the end of the year. Older-skewing clothing brands were right behind popular toy brands at the top of the list.

**Top brands by category**

The 800-plus boys and girls responding to this survey volunteered a total of 1,039 brands. Toys took top honors, with more than 24 percent of nominations specifying a particular toy brand. Clothing brands were a very close second, followed by entertainment-based brands like Hannah Montana, High School Musical, and Pokémon* and shoe brands like Nike, Heelys and Sketchers.

**Top brands by gender**

Specific brands nominated by boys and girls were fairly different, as expected. However, Nintendo, iPod, and Heelys (a shoe brand with toyetic functionality) were mentioned frequently enough by both boys and girls to have made both lists.

Nike, the only clothing brand on the boys' list, received the most mentions, but the remainder of the boys' list is comprised of mostly gaming and electronics brands. That said, the entertainment-based Pokémon brand received the fifth most mentions from boys. Toy brands Lego and Transformers also made the tail end of the list.

Toy brands fall much higher on the girls' list—Webkinz, Bratz and Barbie were all mentioned frequently enough to have made girls' top five. Two entertainment-based brands, High School Musical and Hannah Montana, round out the middle of the girls' list. Interestingly, three clothing brands also made girls' top 10—Abercrombie & Fitch, Limited Too and Aeropostale.

**A lot on their minds**

Toy brands are still considered "cool" among kids 6 to 11, but brands in other categories are taking up a good bit of mind share. Clothing brands are on girls' minds and gaming brands are tops with boys.

*Brands were sorted based on their category of origin, even if they have since expanded into other categories.*

2007's 'Coolest' Brands According to Kids

| Boys' Top 10 Brands | Girls' Top 10 Brands |
|---|---|
| 1. Nike | 1. Webkinz |
| 2. Wii | 2. Bratz |
| 3. Nintendo | 3. High School Musical |
| 4. iPod | 4. Barbie |
| 5. Pokémon | 5. Hannah Montana |
| 6. Xbox | 6. Abercrombie & Fitch |
| 7. Playstation | 7. Limited Too |

iPod (tie)

8. Lego            8. Heelys

9. Heelys          9. Aeropostale

10. Transformers   10. Nintendo

2007's 'Coolest' Toy Brands
According to Kids

| Boys | Girls |
|------|-------|
| Lego | Webkinz |
| Transformers | Bratz |
| Webkinz | Barbie |
| Hot Wheels | Littlest Pet Shop |

**Author Information**

*Nancy Zwiers is CEO of Funosophy Inc., Long Beach, Calif. For additional information on this report, call (562) 436-5251 or email info@funosophy.com.*

« Back | Print

© 2008, Reed Business Information, a division of Reed Elsevier Inc. All Rights Reserved.

Advertisement



# EXHIBIT C

Case 3:08-cv-02873-JSW    Document 36-3    Filed 08/15/2008    Page 27 of 44
Case 1:08-cv-( 7  Document 1-2    Filed 07/22/:  ,  Page 7 of 24
[print version] Webkinz: I .... in love with a cyber alley cat | CNET News.com
Page 1 of 3



**NEWS.COM**   http://www.news.com/

## Webkinz: I fell in love with a cyber alley cat

By Neha Tiwari
http://news.com.com/Webkinz+I+fell+in+love+with+a+cyber+alley+cat/2100-1026_3-6182834.html

Story last modified Fri May 11 10:05:26 PDT 2007

**It's Friday afternoon, and I've called 12 toy stores in the San Francisco Bay Area. All have the same frustrating answer: "We're sold out of Webkinz...sorry. We hope to get a shipment soon."**

I have no children of my own, but I can relate to how parents must feel hearing these heartbreaking words. I also feel a surge of respect for my own mom and dad, who waited in line in the late 1980s for a Go Go My Walkin' Pup or my beloved Magic Nursery Doll--the Webkinz stuffed animal of my generation.

Toys du jour Webkinz, of course, are notably different from good old Go Go or Magic Nursery Dolls. Not only are they cuddly, they're also a portal to an online social network for children, much like MySpace.com and Facebook, only for elementary school-aged kids. Created by Canadian gift company Ganz, the plush toys celebrated their second birthday late last month. To mark this occasion--dubbed Webkinz Day by Ganz--I set out to explore the buzz, and the concern by parents who worry their tots may be spending too much time online.

The phenomenon has been a huge hit; Ganz claims that more than 2 million units have been sold to retailers and 1 million users have registered on the Webkinz site, where kids can create lively domiciles for the virtual versions of their animal, shop for pet paraphernalia, and chat with fellow Webkinz owners.


Click to view ▶

"Webkinz has married two very popular play patterns in one unique toy--cute plush, which brings in nurturing play, combined with online virtual worlds, which have proven to be wildly popular with such brands as Neopets," said Anita Frazier, a toy analyst with The NPD Group.

Last year, Webkinz brought in more than $45 million in retail in the U.S., according to Frazier. "This is great performance for a new brand to realize out of the gate," she noted.

### How much is that doggie on the Web site?
Not surprisingly, that popularity can make it hard to score a Webkinz. The week after my futile first calling frenzy, I followed a lead that a card store near CNET Networks' office would be restocking the furry social networkers soon. It was there that I found my Webkinz, an orange and black alley cat I named Cneta.

Originally, I had hoped to avoid the runaround and find one online, but a Webkinz cat on eBay was selling for $99; on Amazon.com, a Dalmatian Webkinz dog went for $59.99. You get the picture; I was lucky to

snag one at $12.

But if I thought finding a Webkinz was challenging, I was unprepared for just how complex it would be to register a stuffed critter online. A number of documents need to be completed: a lengthy terms of use, plus a disclaimer and registration form, making the process more akin to filing taxes than adopting a toy cat.

After signing up, I was excited to move on and customize my pet's room, much like I personalized my MySpace page with HTML coding. Each Webkinz account starts with 2,000 units of "KinzCash." With that virtual currency, I splurged on a salmon strudel feast for Cneta, as well as a batch of her favorite food, marshmallows, rainbow-patterned boots, a blue striped bed set, a scooter and some horn-rimmed specs.



Kinz cash can go fast, and to regain my loot, I played a round of "Hide 'n' Skunk" or spun the "Wheel of Wow" in the virtual arcade on the Webkinz site. Another option for scoring cash is successfully completing a timed math, language or science quiz at Quizzy's Question Corner. Cneta and I even enlisted as

**Video: Webkinz target kids for early social networking**
Fluffy animals introduce youngsters to online networking.

assistants for Dr. Quack at the Kinz veterinary clinic, and assembled burgers at the Kinz burger joint. As I brought home the Meow Mix for Cneta, she cheered me on via conversation bubbles floating above her head.

But alas, my social interactions on Webkinz were limited to me and my feline. Initially, I thought I would be able to befriend fellow Webkinz owners on the Web site, but I soon realized the chatting and meeting features were few and far between.

The only way to communicate with a Webkinz owner, it turns out, is if you already know someone with an account. Although this is presumably a safety measure by Ganz, it does limit the prospect for interactions with new people. Granted, as someone used to the endless possibilities for contact on other social-networking platforms, I found that to be a constraint. But most parents would probably heave a sigh of relief at this precaution.

"I like that the Web site is user-friendly and that it is safe," said Joanna Hafter, whose kids Talia, 9, and Josh, 7, have eight Webkinz between them. "The games are fun and safe and it is less expensive getting a Webkinz than buying a new software game. I have never seen them so excited to play any other game on the computer. I also like that it is nonviolent."

In addition, Hafter sees Webkinz as a good alternative for parents who don't relish the idea of housebreaking a pet or cleaning cat hair from the couches.

"They are soft and cute, and I think it is very clever that you can go online and have a virtual pet...it is a great substitution if you do not want a live pet," she said.

Not everyone is so thrilled by Webkinz. In Boston, Wessagussett Primary School recently banned the stuffed animals, according to *The Boston Globe*, calling them a distraction. Some parents feel conflicted about the newest toy obsession, as well.

Case 3:08-cv-02872-JSW    Document 36-3    Filed 08/15/2008    Page 29 of 44
Case 4:08-cv-      7    Document 1-2    Filed 07/22/.    }    Page 9 of 24
[print version] Webkinz: I    in love with a cyber alley cat | CNET New...om    Page 3 of 3

Now on News.com
MLB aims brushback pitch at Slingbox Photos: Corbis to take 'microstock' plunge YouTube founders: Video ads coming Extra: Hackers steal municipal funds

"I do not like the fact that kids want to collect them all so as to get more points," said Vicky Kalish, the mother of Elana, 11, and Leah, 7. "My kids pressure me to buy them a new one each week so they can get another 2,000 points (to buy more things on the Web site) versus the 90 points they can achieve by winning things. Clearly, this is part of the company's marketing, and I don't like it. Why isn't having one enough?"

And every parent takes a different approach.

Amy Jo Kim, a game designer and mother of Gabriel, 8, believes it's up to the parent to decide how much is too much when it comes to virtual worlds for kids. "As a parent you can take different stands," she said. "You can ignore it--see it as a 'digital babysitter'--or you can set limits. We set limits in our household.

"An analogy I use is that I look at this stuff like really strong coffee; it gets my son jazzed up, it's addictive, but also something to be very careful with," she added. "It's a very powerful experience. I'm not scared of him having a powerful experience. I want to help him have a good experience, and learn to step away from the keyboard. I'm teaching him how to do that on his own."

Though I am older than most Webkinz users, those same lessons in restraint apply to me. As an avid social networker, at first I checked my Webkinz page many times a day--just about as much as I log on to MySpace and Facebook. Then, fearing the virtual cat would cost me yet another happy hour with friends, I gave myself something of a time-out and started restricting how much I logged on. Yes, I continue to interact with my virtual cat online from time to time, and she's rocking her new red hair ribbon. Sadly, the last time I checked on her, Cneta did seem a bit under the weather. Let's hope it's just a hairball.

Copyright ©1995-2007 CNET Networks, Inc. All rights reserved.

How to Take Money From Di    Sell Toys Both Physical and Virtual 2    Page 10 of 24 Page 1 of 3



<< Back to Article

# How to Take Money From Kids: Sell Toys Both Physical and Virtual

By Jacob Ogles    08.13.07



Children tend and care for their Webkinz avatars much like adults coddle Sims.
*Screenshot: Courtesy of Jacob Ogles*
The latest toy craze in North America are stuffed animals called Webkinz that blend the comfort of teddy bears with the addictive challenges of online role-playing games.

Webkinz look like Beanie Babies, but come with a code to unlock a digital doppelgänger children play with in a *Sims*-like digital world. The combination has proven as habit forming as the Tamagotchi phenomenon, but with a stuffed animal that sleeps in your child's bed. And it might be the ploy that saves the toy industry.

Sold only at specialty stores like Hallmark, more than 1 million Webkinz stuffed animals have been snapped up since their April 2005 debut, making the toy by Ganz a sensation. In February, the Toy Industry Association named Webkinz the Specialty Toy of the Year for 2007.

http://www.wired.com/print/gadgets/miscellaneous/news/2007/07/webkinz                    7/2/2008

"Kids are on the internet at a younger and younger age," said Ganz communications director Susan McVeigh. "They are comfortable in an online environment, more so than their parents. It just feels natural to them."

Webkinz kick-started a trend in children's gaming that ties virtual environments to real-world merchandise. Online games for kids aren't new. Sierra Online had tot-focused games in the early '90s, and Neopets proved a hot product six years ago with a similar concept. But the unprecedented success of Webkinz is inspiring everyone from Barbie to Disney to get children invested in both the digital and the physical.

"This is now a very hot area," said Jim Silver, editor-in-chief of *Toy Wishes* magazine. "We will see more and more toys which have codes that interact with websites."

The strategy is coming into play as physical toy sales decline. Plush remains a $1.3 billion industry, according to the Toy Industry Association, but suffered a 4 percent decline in 2006. Indeed, the toy industry saw hardly any growth between 2005 and 2006.

Video games, meanwhile, saw a 19 percent increase in sales during the same time, and are now a $12.5 billion industry.

Marketed to children ages 6 to 12, Webkinz tries to marry plush with video game. The attempt has brought new relevance to Ganz, a family-run gift company based in Canada. High demand had the company dealing with supply shortages earlier this year, McVeigh said.

Ganz declined to give current sales figures -- it stopped reporting Webkinz sales and online activity a year ago, when it had a million online accounts. But Silver estimates Webkinz raked in $100 million last year.

Retired Webkinz now sell for hundreds of dollars on eBay, and numerous fan-created sites have launched around the Webkinz community.

Ganz has expanded its product line with a range of supporting merchandise, including Pokémon-esque trading cards that come with unlockable goodies to use online. But McVeigh said Ganz, which also sells collectible decorations, is uninterested in selling code on its own.

Now other companies are aping the gimmick. Russ Berrie U.S. Gift launched its own Shining Stars line of soft toys in April. These plush toys come with an online avatar and the chance to name a star through the International Star Registry. Andy Gatto, the company's CEO, said a new Shining Stars account gets created every 22 seconds.

Disney also found success promoting real-world merchandise with virtual fun and games. Disney's Virtual Magic Kingdom is based on the company's physical parks, but is filled with minigames instead of rides. It now boasts 2.5 million users.

Like Webkinz, Disney's virtual world is the bait: The profit comes from real-world promotions and merchandising. Tourists engage in quests in Disney's real theme parks to earn digital exclusives online, and the parks sell some items, including a line of T-shirts, that come with online duplicates for avatars to use.

"We were interested in taking the concept of Disneyland or the Magic Kingdom and extending it online so this kids audience could have contact with Disney theme parks every day, all day long," said Paul Yanover, executive vice president and general manager of Disney Online.

When Expedition Everest opened at Animal Kingdom last year, for example, a month of events were launched at the Virtual Magic Kingdom, and several new virtual products tied to the ride were released.

Disney also has found success with Toontown, a world loosely based on a section of Disneyland. Geared toward virtual gaming, Toontown has a "velvet rope" model: Users can visit some areas for free but need a paid subscription, at $10 a month, for unlimited access. The site has attracted more than 17 million users since its 1998 launch, and a similar Pirates of the Caribbean game is in the works for next year.

Ultimately, each venture will succeed or fail on the quality of the website, according to *Toy Wishes'*

Case 3:08-cv-02873-JSW    Document 36-3    Filed 08/15/2008    Page 32 of 44

Silver. But to some critics, child-oriented gaming sites bring concerns that sexual predators -- like the sex offenders MySpace is trying to rid itself of -- may sign into the Webkinz world.

Webkinz and Shining Stars fight creeps by limiting chat capabilities. While chat is widespread in the Virtual Magic Kingdom, Disney keeps numerous administrators eavesdropping at all times.

These concerns seem unlikely to stop evolution in the marketplace. Russ Berrie's Gatto said the toy industry has always been at the mercy of trends, and has been very responsive to the change in children's habits.

"This really represents a new play pattern, and it is a pattern in its infancy," he said. "Over the next few years, it is just going to get more prevalent in this business."

# EXHIBIT D



# Entertainment Marketers 2008: Howard Ganz

*By* Abbey Klaassen

*Published:* May 19, 2008

Index

Previous: Rich Ross | Next: Tony Sella and Pam Levine



## HOWARD GANZ
### PRESIDENT, GANZ

If imitation is the sincerest form of flattery, then Howard Ganz should be blushing all the way till next Christmas.

His company's Webkinz has inspired a whole new type of toy: the plush creature kids hold dear with the added value of access to a virtual world where they can interact and buy goodies for their virtual creatures. Over the past year, the competition has taken note: Mattel has launched BarbieGirls.com, Ty launched Beanie Babies 2.0, Bratz has Be-Bratz.com and Build-A-Bear has Build-A-Bearville, just to name a few.

*Selected for:*
**Webkinz**

But Webkinz got an early start -- and that's crucial for online communities. And that is nowhere more evident than in Webkinz sales for the 2007 holiday season. Ganz, the privately held company that produces Webkinz, doesn't report sales figures, but stores such as Limited Too, which stocked the toys for the first time this past holiday season, cited the products as top sellers. Webkinz recently began selling more ancillary accessories and launched some seasonal offerings: a reindeer and penguin.



- It's a plush toy; it's an online adventure
- NPD analyst: The combination is "magical"
- Sales and web traffic see huge holiday boost

Website traffic also tells the story. Traffic to Webkinz.com jumped about 20% during the holiday season, according to Compete. Traffic is down slightly from its December high but still boasts about 6.4 million unique visitors a month, according to the service, enough to double Club Penguin and 50% more than Neopets. Recently, Silicon Alley Insider valued the Webkinz world at $2 billion, based partly on Walt Disney Co.'s Club Penguin buy for $750 million.

**Blogging Webkinz**
The company relies on word-of-mouth advertising. A search for Webkinz-related blogs on Technorati turns up 967 blogs about the product.

It was around Easter 2007 that the brand really started to take off, says Anita Frazier, industry analyst for NPD Group, and early scarcity issues were alleviated by the holiday season. She calls the tried-and-true plush toys tied to a rich virtual environment "magical. ... We've found most kids are actively playing both the online version ... and with the physical toy. If either one didn't work on its own, I don't think the combination would be as magical."

While Ganz doesn't talk much about its success or ruminate on why and how it's become so popular, a spokeswoman did say the most recent holiday season owes much of its success to higher awareness of the product. Susan McVeigh, director of communications, touts the benefit of Webkinz being a "safe purchase" for parents. "It was a comfortable choice."

Previous: Rich Ross | Next: Tony Sella and Pam Levine

Index

Copyright © 1992-2008 Crain Communications | Privacy Statement | Contact Us

# EXHIBIT E

# TDmonthly™

*a trade magazine for the toy, hobby, game & gift industry*

brought to you by:
'n TOY
July 2, 2008

January 2008 | Vol. VII - No. 1

## Top-10 Best-Selling Holiday Toys for Girls
### Critters Take Over Christmas

By Sheila M. Coyle
January 2008

*With additional reporting by Virginia Davis, Terri Hughes-Lazzell and Brenda Ruggiero*

Six of 27 toy-store owners reported to **TDmonthly Magazine** Dec. 26 to 28 that **Calico Critters** by **International Playthings** was the most-bought girl toy for the holidays 2007. Close behind were **Corolle** baby dolls. Since many retailers don't divide toys by gender, **Bananagrams, Webkinz** and craft kits did well, too.

Here's what wound up in little girls' playrooms after the holidays:

## Calico Critters - A Carriage Ride for Connor & Kerri by INTERNATIONAL PLAYTHINGS INC.

Connor and Kerri Snow-Warren bounce happily in their carriage as Mother Shannon takes them for a stroll to Cloverleaf Corners' Community Park. The Carriage Ride for the Connor & Kerri set includes Mother Shannon Snow-Warren Rabbit, the Snow-Warren Rabbit twins Connor and Kerri, a pram with a pillow and blanket, a rattle and a bottle. This playset also comes with a storybook about the Snow-Warren family.



— "You know what? Calico Critters do great in [the 4 to 8] age range," said Linda Hays, owner of Hopscotch Inc. in McMinnville, Ore., when sharing her Christmas 2007 predictions with **TDmonthly**. Six of 54 retailers agreed.
— "Calico Critters: It's been crazy and I expect it to continue," said Cathy Foland, manager for Imagination Station in Fenton, Mich., when discussing the upcoming 2007 holiday season.
— "The carriage is highly detailed with moving wheels, sun shade, pillow and blanket," said Sue Tice for International Playthings. 9/20/2007 (MSRP: $16.99; Age: 3 and Up)

## Calin Cheerful Bright by COROLLE DOLLS



Thanks to its cuddly soft beanbag body, Calin Cheerful Bright can be posed just like a real baby. The 12" doll has blue sleeping eyes, can wear fashion from the Mon Premier collection, and can have a number of accessories added to it from the Corolle line.
— "Probably any of my Calin from Corolle" serve as the best-selling items in dolls, according to Mary Sisson, owner of Kazoodles in Vancouver, Wash.
— "We sell different styles [of Calin]. About 30 a month," Marilyn Walker, owner of PlayFair Toys in Boulder, Colo., told **TDmonthly** in January 2008. 6/14/2007 (MSRP: $26.99; Age: 2 and Up)

## Bananagrams by BANANAGRAMS



The fast-moving word game consists of 144 ivory-like letter tiles all contained in a funky, zippered banana pouch. No other materials are required. Players place all the tiles face down on the table and then randomly select 21 tiles. The players turn their letters right-side up simultaneously and quickly proceed to form as many intersecting and interconnecting words as possible from their own letters, which can be rearranged as many times as desired throughout the game. This product received a 2006 Oppenheim Toy Portfolio Gold Seal Award and earned the following in 2007: iParenting Media Award, Parents' Choice Recommended Award and Dr. Toy Best Products Award. (Read Review) **(Watch Games Expo Video)**
— Three of 25 retailers mentioned Bananagrams as a Toy Fair favorite. "It's real cute; that's a nice little travel item," Owner Debbie Scholl of Fundamentally Toys in Houston commented to **TDmonthly**.
— Who knew that words could be more fun than a barrel of monkey's chow? The folks at Bananagrams. They transformed great-auntie's game night into fast-playing, fruity-colored fun in a banana sack. The irresistible display of hanging Bananagrams bunches makes it an easy sell, and a natural winner of a **TDmonthly Top Seller 2007** award.
— In terms of 2007 holiday stocking stuffers, "Bananagrams [were] selling immediately," Rick Henry of Stellabella Toys in Cambridge, Mass., told **TDmonthly**. Eight of 66 retailers vouched for the best-selling status of Bananagrams in May 2008. One of those, Owner Teresa Ford of Kids' Ketch in Lewes, Del., said she sells 48 units per month. (**Watch Video**) 6/19/2006 (MSRP: $14.99; Age: 7 and Up)

## Webkinz - Hippo by GANZ



To help meet the demand for Webkinz sweeping the continent, Ganz has come out with a new line of Lil'Kinz. Like their larger counterparts, Lil'Kinz characters come with their own codes that are revealed after purchase. Kids adopt the little guys as their own and take them into an online world of fun and KinzKash. Kids can now make Lil'Kinz Hippo their best buddy, play some games at the arcade and stop by the "W" shop to pick up a bowl of crunch "shoots n' roots."
— "We sold over 2,000," Gwen Boden said of how Webkinz fared in 2007. Boden is the manager of Doodlehopper in Springfield, Va.
— "Webkinz: We sell daily, hourly," Robin Eilerman, owner of Trains-n-Toys in North Canton, Ohio, told **TDmonthly**.
— Over 21 percent of retailers told **TDmonthly** that Webkinz was their all-around best-selling item of 2007. 11/12/2007 (MSRP: $12.00; Age: 3 and Up)

## Wee Enchanted Fairy Garden by CREATIVITY FOR KIDS

With a little creative magic, a child can grow his or her own enchanted fairy world. The garden set includes a flower house, tiny gemstone treasures, flowers, butterflies, paint, soil and seeds that grow like magic. It also comes with a friendly fairy, a sparkling garden path and teeny, tiny toadstools. 10/22/2007 (MSRP: $24.99; Age: 7 and Up)



## Cutting Food Box by MELISSA & DOUG



The Cutting Food Box is a super-sized play-food set that comes with a child-safe knife. Kids prepare their own healthy meals, cut into them as they make a crunching sound, and then have fun trying to put them back together again. The set includes a cutting board and a wooden crate for easy storage.
— "I think Melissa & Doug certainly ramped up the trend toward wooden toys

in designing things like the food-cutting box out of wood," said Nancy Streeter, owner of Eureka in Newburyport, Mass.
— Melissa & Doug dominated the wooden toys' category in an early 2007 survey, as the brand was cited more than 50 times by a collective 51 retailers.
— Two of 39 retailers told **TDmonthly** that Melissa & Doug cutting foods make popular playsets. 1/31/2007 (MSRP: $19.95; Age: 3 and Up)

## Middleton Doll My First Nursery Baby™ by LEE MIDDLETON ORIGINAL DOLLS INC.



The My First Nursery Baby™ provides a complete package for a young lady's first doll. Sculpted by award-winning artist Reva Schick, this baby's open mouth allows little girls to feed the newborn with the included bottle or have her suck her thumb, all while wrapped in her own blanket. This 14.25"-, 1-lb.-doll features blue eyes, a light skin tone, a newborn face and a lavender sleeper with a matching cap.
— The Lee Middleton brand ranks among the "top dolls" at Clever Kids in Rochester, Minn. "We offer them on the Internet and they are doing very well," Owner Michelle Beyer said in late 2007.
— Seven of 62 retailers cited Lee Middleton when discussing best-selling dolls with **TDmonthly** in spring 2007. A few dolls a month was the average sales figure.
— "Mom's favorite feature with this doll is that it's completely washable," said Ken Werner, president of consumer products for the Middleton Doll Company. 6/11/2007 (MSRP: $24.95; Age: 2 to 3)

## Girls' Purse by POSH INTERNATIONAL LTD.



This shiny, synthetic leather purse features a sparkling silver-glitter handle on metal rings. Stylish, yet roomy, this 14" x 10" purse comes with a top zipper—the latest trend for kids and tweens. Rhinestones and a silver-glitter belt embellish the purse. Available styles include Lite Pink, Hot Pink, White, Purple, Silver and Bronze. Launch date: January 2007. 5/21/2007 (MSRP: $14.95; Age: 4 and Up)

## Pastel Pink Panne Velvet, Long Sparkle Sleeve Ballet Dress with Pastel Pink Bottom by ADORABLE KIDS



This soft, comfortable and pretty outfit is easy to wear. Roses are attached to the bottom, and it's available in medium (8-10), height 50" to 54". 12/28/2007 (MSRP: $58.00; Age: 4 and Up)

## Maggie Visits Christmas Town by ALEXANDER DOLL CO. INC.



Part of "The Nightmare Before Christmas" collection, 8" Maggie comes with two Christmas Town elves. She is decked out in red and green winter garb, including elf shoes and an elf hat. Launch date: November 2007. 7/13/2007 (MSRP: $84.95; Age: 3 and Up)

© Copyright 2007 TDmonthly™, a division of ToyDirectory.com®, Inc.

# EXHIBIT F



# EXHIBIT G



# GANZ

# 043
60 Industrial Parkway
Cheektowaga, NY 14227-9903

## WEBKINZ LOYALTY PROGRAM

As we strive to make it easier for you to do business with GANZ and to ensure fair distribution of our exciting new Webkinz products, we are pleased to announce the Webkinz Loyalty Program. This Program is designed to provide our loyal customers with a fair and equal opportunity to get orders for new items shipped in priority sequence.

It is important to note that participation in the Program is not a requirement for buying Webkinz merchandise. However, participation will establish priority shipping status.

Please note that in order to qualify for the Webkinz Loyalty Program, a customer must meet the following criteria:

* be an active Ganz customer in good standing
* have a valid email address on file
* have signed and returned a copy of the Webkinz Letter of Understanding to Ganz.

### CUSTOMER PREFERRED STATUS

The Program provides initial distribution of new Webkinz items based on a "preferred" customer level. The level is determined based on the value of Core shipments in the preceding rolling 12-month period. "Core" merchandise is defined as non-Webkinz merchandise for the purpose of this Program.

There will be three customer levels in the Webkinz Loyalty Program as indicated below. Note that the "Initial Shipment Quantities" associated with each level have been provided for example purposes only. Your sales representative will advise you of the actual initial quantities at the time an order is placed. Gold and Silver customers are entitled to order quantities exceeding the minimum as indicated below. Ordering the minimum quantity will not affect your shipping priority according to your status. Customers may also elect to place orders exceeding the maximum initial shipment quantity. However, the items exceeding the maximum will not ship until all Program shipments have been completed. (See examples below under the heading "Shipping Windows".)

|  | 12 month Core shipments | Initial Shipment Qty (example only) | First Shipping Window | Second Shipping Window |
|---|---|---|---|---|
| GOLD | > $10,000 | maximum: 108 pieces minimum: 36 pieces | Release Date | Ship Date 2 |
| SILVER | $5,000 - $9,999 | maximum: 72 pieces minimum: 36 pieces | Release Date + 1 Day | Ship Date 2 + 1 Day |
| BRONZE | $2,500 - $4,999 | maximum and minimum: 36 pieces | Release Date + 2 Days | Ship Date 2 + 2 Days |

### PRIORITY SHIPPING

The requested shipping dates associated with each customer level will dictate the sequence in which orders ship. Gold member orders will ship first; Silver member orders will ship second, followed by Bronze member orders. Orders will ship according to inventory availability and not necessarily on the shipping dates assigned to the levels but will maintain the order of priority sequence. No customer will have their

Telephone: 1-800-724-5902 Facsimile: (905) 851-8669

# GANZ

# 043
60 Industrial Parkway
Cheektowaga, NY 14227-9903

second order shipped until all eligible customers have had their first orders shipped. Also, a customer can override the shipping date assigned to their level and elect to have a later shipping date. In this case, the order will be given shipping priority according to the selected date.

Customers that do not qualify for one of the Program levels will be able to place orders for future release Webkinz merchandise with a requested ship date set to one week after the final ship date for Bronze orders.

Future releases of Webkinz merchandise are discussed with our customers in complete confidence and customers have agreed, pursuant to the Letter of Understanding, to keep this information strictly confidential until the information is made publicly available by Ganz. Ganz will not accept substitutions or alterations to the Program. Once a customer places an order in accordance with the Program, that participation cannot be cancelled by the customer and the customer must accept all goods shipped in accordance with the Letter of Understanding.

## SHIPPING WINDOWS

Ganz will determine the number of shipping windows associated with each release in advance of the release date. This will ensure that all customers in the Program will have an opportunity to place orders for each shipping window. To facilitate ordering, the customer can place one large order, which Ganz will split according to their preferred status and shipping window schedule. Residual orders will be created for the balance of the order, which will be placed to ship after the Program orders have shipped to all customers participating in the Program.

Examples:

Customer A – Gold Status ordering 500 pieces of Webkinz Plush
    Order 1:        108 pieces for shipment in Shipping Window 1 (Release Date)
    Order 2:        108 pieces for shipment in Shipping Window 2
    Order 3:        284 pieces for shipment after all Program shipments are completed

Customer B – Bronze Status ordering 500 pieces of Webkinz Plush
    Order 1:        36 pieces for shipment in Shipping Window 1 (Release Date)
    Order 2:        36 pieces for shipment in Shipping Window 2
    Order 3:        428 pieces for shipment after all Program shipments are completed

E-mail confirmations of orders will be sent to each customer after the orders are split, advising of quantities and approximate shipping window dates.

Please note if a purchase order number is required, each split order will reference the original purchase order number.

## Webkinz Payment Terms Policy

The payment terms for Webkinz merchandise orders are as follows:
Orders shipped during the 1st and 4th quarters of the year are net 30 days.
Orders shipped during the 2nd and 3rd quarters of the year are net 60 days.

*We look forward to sharing the benefits of the new Webkinz Loyalty Program with you.*
*Please contact your Ganz Sales Representative should you have any questions about the Program.*
*Thank you for your continued patronage.*

Telephone: 1-800-724-5902 Facsimile: (905) 851-8669